IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

DEBRA LYNN, on behalf of                                              PLAINTIFF
Kerry Dale Lynn

v.                         NO. 3:16-cv-00313 PSH

NANCY A. BERRYHILL, Acting Commissioner                               DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Debra Lynn, on behalf of her late father Kerry Dale Lynn ("Lynn"), began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, plaintiff challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon findings made by an Administrative Law Judge ("ALJ").

Plaintiff maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Plaintiff first maintains that Lynn's residual functional capacity was erroneously assessed. Plaintiff so maintains because the record does not contain a physical residual functional capacity assessment from a treating or examining physician, Lynn's morbid obesity was not adequately considered, and there is no evidence he could sit for long periods.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). As a part of making the assessment, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ does so by considering the medical evidence and evidence of the claimant's daily activities; the duration, frequency, and intensity of his pain; the dosage and effectiveness of his medication; precipitating and aggravating factors; and functional restrictions. See Id. at 1218 [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

Lynn alleged in his application for disability insurance benefits that he became disabled on September 30, 2009. Although that date would typically denote the beginning of the relevant period, the ALJ found the following:

> Claimant's alleged onset date is September 30, 2009. However, claimant has filed prior applications. The claimant filed a prior application that resulted in an unfavorable decision before an administrative law judge on September 27, 2013. There is no basis to reopen the prior application and administrative finality applies through September 27, 2013. Accordingly, any discussion of the evidence prior to that time is for historical and contextual purposes only and does not constitute reopening.

See Transcript at 21. Plaintiff does not challenge the finding, and it is supported by substantial evidence on the record as a whole. Thus, the relevant period is from September 28, 2013, through November 12, 2015, i.e., the date of the ALJ's decision. Evidence prior to September 28, 2013, will only be considered for historical purposes.

Plaintiff has ably summarized the evidence in the record, see Document 19 at CM/ECF 3-17, and the Commissioner does not challenge the summary. The Court accepts the summary as a fair summation of the evidence. The summary will not be reproduced, save to note evidence germane to Lynn's morbid obesity and his ability to sit for long periods as those issues form the basis of plaintiff's challenge to the ALJ's assessment.

On November 2, 2009, an MRI was taken of Lynn's cervical spine. See Transcript at 326-328. The results revealed mild degenerative disc changes in his cervical spine but no significant central canal narrowing. When Dr. Jeremy Swymn, M.D., ("Swymn") saw Lynn one week later, Swymn observed that the MRI showed no nerve impingement. See Transcript at 330.

Lynn sought medical attention on several occasions between September 2, 2009, and September 28, 2013, for complaints that included chest pain, shortness of breath, and pain and swelling in his lower extremities. See Transcript at 684-686, 688-690, 650-652, 642-646, 627-632, 615-620, 572-580, 581-583, 558-567, 543-552, 526-536, 892-293, 522-523, 507-515, 491-498, 436-446, 407-413, 404-405, 387-388. For instance, on March 19, 2010, he presented to a hospital complaining of pain and swelling in his lower extremities. See Transcript at 684-690. A history of Meniere's disease was noted, and he was diagnosed with leg edema and venous insufficiency. In August of 2012, he presented to the hospital complaining of chest pain and shortness of breath. The results of an EKG were normal, his troponins were negative, and a chest x-ray was unremarkable. See Transcript at 412. Obstructive sleep apnea syndrome was later diagnosed, and use of a CPAP was recommended.

After September 28, 2013, the record reflects that Lynn continued to seek medical attention for complaints that included chest pain and shortness of breath. Lynn saw Dr. John House, M.D., ("House") on January 16, 2014, for other impairments. See Transcript at 337-341, 770-774. While in the examination room, Lynn experienced a syncopal event. Lynn was transported to a local hospital and admitted for the syncope event and abdominal pain. He was released later that same day after test results were within normal limits. See Transcript at 344.

House saw Lynn again on January 22, 2014. See Transcript at 766-770. House's progress notes contain the following notation:

> … [Lynn] was seen here last week and had syncopal event. Was sent to the ER by ambulance. Was admitted for "severe dehydration." Notes that they did ultrasound of heart, neck, and legs. No blood clots. Had two EKGs which were normal. Says that they did CT of head, neck, and low back. The only finding was chronic sinusitis. Says that they stopped lasix and spironolactone. Also stopped metformin due to CT. Has restarted metformin.

See Transcript at 768.

Lynn continued to see House or his associates throughout 2014. See Transcript at 762-766 (03/11/2014), 759-762 (04/23/2014), 755-759 (05/22/2014), 751-755 (06/17/2014), 747-751 (07/31/2014), 743-747 (09/30/2014). The progress notes from the examinations are routine. For instance, when Lynn presented on May 22, 2014, he reported that he had been exercising but was sore from "trying to lift light weight." See Transcript 757. Upon examination, he exhibited normal tone and motor strength and exhibited normal movement in all of his extremities. Diabetes, hypertension, and a history of pulmonary embolus were diagnosed, and medication was prescribed.

Lynn sought medical attention from other medical care providers during 2014. See Transcript at 699-704 (06/03/2014), 731-734 (08/07/2014), 728 (08/07/2014), 740-743 (10/14/2014), 859-865 (12/07/2014). The progress notes from those examinations are routine and shed little light on his postural limitations. It is noteworthy that during the December 7, 2014, examination, he reported that he was only experiencing mild soreness in his right calf. See Transcript at 860.

In 2015, Lynn sought medical attention for complaints that included sinusitis and painful feet. See Transcript at 919-922 (01/06/2015), 939-940 (06/02/2015), 938 (06/23/2015), 926-930 (06/30/2015), 969-973 (08/04/2015), 942 (08/11/2015). The progress notes from the examinations are also routine. The notes reflect that he continued to receive medication for his sinusitis and was prescribed medication for the cracking and dryness in his heels. It is worth noting that he was seen by an advanced practice nurse at House's office on January 6, 2015, and was observed to be "ambulating normally." See Transcript at 921. Upon examination, Lynn had normal tone and motor strength and had normal movement in all of his extremities.

On September 18, 2015, Lynn sought medical attention for complaints that included abdominal and low back pain. See Transcript at 1021-1026. Pancreatitis was diagnosed. He was subsequently diagnosed with pancreatic cancer, see Transcript at 1051, and died from the illness on June 17, 2016, see Transcript at 1706.

An assessment was made of Lynn's physical residual functional capacity by state agency physicians. See Transcript at 72-78, 86-92, 100-107, 116-123. They opined that he was capable of sitting for about six hours in an eight hour workday and was therefore capable of performing light work with some additional postural limitations.

The record contains a history of Lynn's reportable earnings for the years 1998 through 2010. <u>See</u> Transcript at 211-212. The history reflects that he had regular reportable earnings through 2010.

Lynn completed a series of documents in connection with his application for disability insurance benefits. <u>See</u> Transcript at 232-242, 243-245, 249-256. In a pain report, he represented that he experienced constant pain in his legs. He could only sit for about fifteen minutes at one time before he began to experience pain, and nothing other than medication helped relieve the pain. He was taking Coumadin and Lasix for venous insufficiency.

In a function report, Lynn represented that his daily activities included eating meals, watching television, texting or playing games on his telephone, and going outside when the weather permitted. He could not attend to his own personal care but could prepare simple meals and do some house and yard work. He could shop and did so once a week for about forty-five minutes at a time. His hobbies and interests included watching television and playing games on his telephone, activities he did daily and managed well.

Lynn testified during the administrative hearing. <u>See</u> Transcript at 41-59. He was born on December 12, 1972, and graduated from high school. He stood seventy inches tall and weighed 412 pounds. He was able to, and did, drive an automobile. He worked until sometime in 2010 when he stopped working because of stress and pain in his neck and legs. He had venous insufficiency in his legs which gave rise to difficulties standing, walking, and sitting. He was taking Lasix, and it helped reduce the fluid in his legs. Lynn could attend to his own personal care and could perform some household chores.

He would occasionally entertain friends and would attend church when he could. When asked if he could work a job that combined standing and sitting for eight hours, he testified that he did not know if he could perform the requirements of such work because of the pain in his legs. He typically did not sit for more than thirty to forty minutes at a time. When watching television or sitting for prolonged periods, he would alternate between sitting and standing. The heaviest he ever weighed was approximately 492 pounds.

The ALJ found at step two of the sequential evaluation process that Lynn had severe impairments in the form of "degenerative disc disease of the cervical and lumbar spine, diabetes mellitus, hypertension, obstructive sleep apnea, Meniere's disease, morbid obesity, GERD, and lower extremity venous insufficiency. See Transcript at 24. The ALJ assessed Lynn's residual functional capacity and found that he could perform sedentary work with the following additional limitations:

> … claimant can stand and or walk for no more than two hours of an eight hour workday; … cannot climb ladders, ropes or scaffolds; … cannot perform balancing duties in the workplace; … can perform no more than occasional climbing of ramps or stairs; … can no more than occasionally stoop, kneel, crouch[], or crawl; … cannot be exposed to unprotected heights, or hazards in the workplace; and … cannot operate foot controls with the lower extremities.

See Transcript at 25. In making the foregoing findings, the ALJ evaluated all of the evidence, including the opinions offered by the state agency physicians. The ALJ gave the state agency physicians' opinions little weight because the physicians failed to consider the combined effects of Lynn's impairments and because the physicians did not hear his testimony regarding his ability to stand and walk.

7

Lynn had postural limitations caused by venous insufficiency and degenerative disc disease. The ALJ incorporated limitations for the impairments into the assessment of Lynn's residual functional capacity but found that he could perform the sitting requirements of sedentary work. The ALJ could find as he did as substantial evidence on the record as a whole supports his consideration of the evidence and his assessment of Lynn's residual functional capacity. The Court so finds for the following reasons.

First, the ALJ adequately considered the medical evidence relevant to Lynn's postural limitations. For instance, the ALJ properly noted the results of MRI testing, results that showed Lynn to have mild degenerative disc disease with no nerve impingement. At a December of 2014 examination, Lynn represented that he had only mild soreness in his right calf. The ALJ properly noted that in January of 2015, Lynn was observed to be ambulating normally. Lynn also exhibited normal tone and motor strength and normal movement in all of his extremities. The ALJ noted the evidence relevant to Lynn's excessive weight, evidence that reflects his Body Mass Index ("BMI") was in the range of fifty-six to fifty-eight or within the morbidly obese range. The ALJ additionally noted the evidence relevant to Lynn's leg pain, pain attributed primarily to venous insufficiency.

Second, the ALJ adequately considered the non-medical evidence relevant to Lynn's postural limitations. The ALJ could and did properly note that Lynn's daily activities were inconsistent with an inability to perform work-related activities. Specifically, the ALJ could and did note that Lynn shopped, did some house work, watched television, drove an automobile, sat with family and friends while talking, and attended church when he could. The ALJ could and did note, inter alia, that no

physician ever imposed any restrictions upon Lynn's activities. Additionally, the ALJ could and did note that Lynn was not compliant with the use of a CPAP, but Lynn's medications were helpful in treating his symptoms. For instance, Lynn was using Coumadin and Lasix for his venous insufficiency, and the medications appear to have helped reduced the fluids in his legs. The ALJ could and did note that Lynn's symptoms were treated conservatively, specifically noting that surgery was never recommended.

Plaintiff challenges the assessment of Lynn's residual functional capacity because the record does not contain a physical assessment from a treating or examining physician and cites the Court to Nevland v. Apfel, 204 F.3d 853 (8th Cir. 2000), in support of the proposition.[2] Although it is true that there is no assessment of Lynn's physical abilities by a treating or examining physician, and such an assessment would have been helpful, a remand is not warranted because the record contains ample evidence for the ALJ to have made an informed decision.[3] A fair reading of the ALJ's decision reflects that he relied upon the relevant evidence in making the assessment, and the assessment is consistent with the evidence. It is also worth observing that the ALJ is not required to link each part of the assessment with a specific medical opinion. See Martise v. Astrue, 641 F.3d 909 (8th Cir. 2011). Moreover, unlike in Nevland v. Apfel, the ALJ in this instance did not base his decision solely on the opinions of the state agency physicians. Instead, the ALJ discounted their opinions and ultimately determined that Lynn was more limited than what they opined.

---

[2] In Nevland v. Apfel, the Court of Appeals reversed the ALJ's decision because he relied solely upon the opinions of non-examining, non-treating physicians in determining that a claimant was not disabled.

[3] "[T]here is no requirement that a [residual functional capacity] finding be supported by a specific medical opinion," see Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), and the ALJ has the discretion whether to order a consultative examination, see Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004).

Plaintiff challenges the assessment of Lynn's residual functional capacity because his morbid obesity was not adequately considered. The record establishes otherwise. The ALJ found Lynn's morbid obesity to be a severe impairment at step two; considered his morbid obesity as "an aggravating factor to any other severe impairment that in combination would meet a listing," see Transcript at 24; then considered his morbid obesity in conjunction with his other impairments. The ALJ found, and substantial evidence on the record as a whole supports the finding, that Lynn had a BMI in excess of fifty-six but had attempted exercise and attended a weight loss seminar. There is nothing to suggest the ALJ's consideration of the evidence was flawed or was somehow inadequate.

Plaintiff also challenges the assessment of Lynn's residual functional capacity because there is no evidence he could sit for long periods. The ALJ could and did properly find, though, that Lynn was capable of performing the sitting requirement of sedentary work. The findings and observations of the medical professionals with regard to Lynn's gait, station, range of motion, and muscle strength and tone were largely unremarkable. When Lynn was seen at House's clinic in May of 2014, Lynn reported having exercised but was sore from "trying to lift light weight." When Lynn was seen by another medical professional in December of 2014, Lynn reported only mild soreness in his right calf. In January of 2015, an advanced practice nurse at House's clinic observed that Lynn was ambulating normally. Moreover, Lynn's daily activities were inconsistent with his assertion of disabling pain. His activities included shopping, doing some house work, watching television, driving an automobile, sitting with family and friends while talking, and attending church when he could.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). In this instance, the ALJ's assessment of Lynn's residual functional capacity was not improper.

Plaintiff offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Plaintiff maintains that the ALJ's hypothetical question did not incorporate Lynn's morbid obesity.

Testimony from a vocational expert is substantial evidence on the record as a whole only when "the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies." See Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997). Thus, the hypothetical question must include all those impairments that are substantially supported by the record as a whole. See Id.

The record reflects that a vocational expert testified during the administrative hearing. See Transcript at 59-62. The vocational expert summarized Lynn's past work, and the ALJ found that Lynn could not return to his past work because it involved greater than sedentary work. The ALJ then posed a series of hypothetical questions to the vocational expert, none of which specifically mentioned Lynn's excess weight. The vocational expert testified that a hypothetical individual with Lynn's limitations could perform work as a telephone quote clerk and a table worker. The ALJ relied upon the vocational expert's answers and found at step five that there was other work Lynn could perform. The ALJ therefore found that Lynn was not disabled for purposes of the Social Security Act.

Substantial evidence on the record as a whole supports the ALJ's hypothetical questions and his finding at step five. It is true that the questions did not specifically mention "morbid obesity," but the ALJ's failure to include any mention of "morbid obesity" in the questions does not warrant a remand. The questions adequately captured the concrete consequences of Lynn's deficiencies, deficiencies that included his morbid obesity, and the limitations they cause. The individual identified in the hypothetical questions was restricted to "sedentary exertional work as [the phrase is] defined in the Dictionary of Occupational Titles with standing and walking not more than two hours of an eight-hour day for the worker," could not climb ladders, ropes, or scaffolds, could not perform balancing functions, and could no more than occasionally perform the "remaining postural functions." See Transcript at 60.[1]

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Plaintiff's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 26th day of June, 2017.

_____
UNITED STATES MAGISTRATE JUDGE

---

[1] Plaintiff maintains that Morrison v. Apfel, 146 F.3d 625 (8th Cir. 1998), requires the ALJ to specifically include the claimant's obesity in formulating a hypothetical question. Her reliance on Morrison v. Apfel in this instance, though, is misplaced because there is no evidence Lynn's morbid obesity was ever identified as a "major medical issue." See Burnett v. Colvin, 2014 WL 5795788 at 2 (E.D.Ark. 2014) (Kearney, J.).